UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEIL BADER,

                Plaintiff,

WELLS FARGO HOME MORTGAGE INC., a
wholly owned division of WELLS FARGO
BANK, N.A.,

                Defendants.

09 Civ. 9410 (RJH)

JASON AUERBACH,

                Plaintiff,

WELLS FARGO HOME MORTGAGE INC., a
wholly owned division of WELLS FARGO
BANK, N.A.,

                Defendants.

10 Civ. 2717 (RJH)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

Richard J. Holwell, District Judge:

      Plaintiffs Neil Bader ("Bader") and Jason Auerbach ("Auerbach") allege that their

former employer, defendant Wells Fargo Home Mortgage Inc. ("Wells Fargo"), has

wrongfully withheld various forms of bonus compensation in breach of employment

agreements.  Both Bader and Auerbach also assert a series of claims sounding in quasi-

contract as well as a claim under the New York Labor Law.  Wells Fargo has moved for

judgment on the pleadings with respect to Bader's complaint and has moved to dismiss

substantial portions of Auerbach's complaint.  For the reasons set forth below, the Court

grants in part and denies in part both Wells Fargo's motion for judgment on the pleadings as to Bader's complaint and Wells Fargo's motion to dismiss Auerbach's complaint.

## BACKGROUND

### A. Bader

Bader joined Wells Fargo on August 1, 2003 as a branch manager.  (Bader Compl. ¶ 22.)  In 2004, Bader was promoted to Area Manager.  (*Id.* ¶ 26.)  Bader appears to have been a very successful Area Manager.  In 2006, Bader qualified for Wells Fargo's "Leader's Club, in recognition of his high level of success as an Area Manager at Wells Fargo" and was asked to attend the event in 2007 "in recognition of his significant contributions to his team and Wells Fargo" despite the fact that he did not formally qualify to attend.  (*Id.* ¶¶ 31-32.)  Indeed, in 2007, at the direction of his regional manager, Bader turned the Brooklyn Wells Fargo branch—"a weak territory"—into one of the eleven most profitable Wells Fargo branches in America.  (*Id.* ¶¶ 27-29.)  This made Bader the top-ranked Area Manager in the United States.  (*Id.* ¶ 30.)

Bader continued this performance in 2008.  In that year, three branches in Bader's area were among the top eleven branches nationwide.  (*Id.* ¶ 36.)  Not surprisingly, Bader's managers reported that Bader's performance was "terrific" and that he was doing a "[g]reat [j]ob" and identified Bader as one of the top thirteen Area Managers at Wells Fargo.  (*Id.* ¶¶ 37-40.)

As an Area Manager, Bader was eligible to receive various forms of incentive compensation.   Of relevance here, from 2003 through 2008, Bader was eligible to receive and did receive three kinds of incentive compensation based on (1) the Net Operating Income of Wells Fargo's New York Metropolitan territory (the "NOI Bonus");

(2) the monthly volume of loans funded by employees reporting directly and indirectly to Bader (the "Volume Overrides"); and (3) a combination of the two ("the Volume Override True-Up").   (*Id.* ¶¶ 41-42.)   Subject to specific, standardized conditions, Bader was also eligible to receive each of these forms of incentive compensation in 2009 under the "Wells Fargo Home Mortgage 2009 Incentive Compensation Plan for Area Home Manager" (the "2009 Area Manager Plan"), which was effective January 1, 2009.   (*See* Aff. of Steven Cooper in Supp. of Def.'s Mot. for J. on the Pleadings ("Cooper Bader Aff.") Ex. B.)   That plan provided that it was "subject to change at any time during the Plan Year at [Wells Fargo's] sole discretion."   (*Id.* at 1.)

Under the 2009 Area Manager Plan, Area Managers could earn an NOI Bonus equal to a percentage of the Net Operating Income ("NOI") earned by branches under their management.   (*See id.* at 4.)   The greater their branches' NOI, the greater the percentage Area Managers could earn.   (*See id.*).   However, an Area Manager "must [have] be[en] employed by [Wells Fargo Home Mortgage] or an affiliate on December 31, 2009 to be considered for an Annual Net Income Bonus . . . ."   (*Id.*)

Area Managers could also earn monthly Volume Overrides equal to a percentage of the loan volume funded in a given month by employees of branches in their area.   (*Id.* at 2.)   The more employees under the Area Manager's management and the greater the year-to-date NOI earned from the branches under the Area Manager's management, the greater the percentage Area Managers could earn.   (*Id.* at 2.)   Area Managers whose branches earned year-to-date NOI per loan less than $1,325 per loan were eligible for Volume Overrides at Column A rates; Area Managers whose branches earned year-to-date NOI per loan equal to or greater than $1,325 per loan were eligible for Volume

Overrides at Column B rates. (*See id.*) The 2009 Area Manager Plan specifically addressed how Volume Overrides would be paid in the event that an Area Manager was terminated: "Payment of the standard monthly volume override . . . shall be based upon eligible loans that fund on or before the date of the Employee's termination. [An Area Manager] shall not receive any volume override on loans that fund after the Employee's date of termination." (*Id.* at 7.)

Finally, Area Managers could benefit from a "Volume Override True-Up" if, at the end of the year, their branches' year-to-date NOI was equal to or exceeded the $1,325 per loan threshold. In that case, any Area Managers who had earned Volume Overrides at Column A rates could earn the difference between those rates and Column B rates. (*See id.* at 2.) However, if, at the end of the year, the branches' year-to-date NOI was less than $1,325, Area Managers who had earned Volume Overrides at Column B rates owed Wells Fargo the difference between those rates and Column A rates. (*See id.* at 3.) In any event, under the 2009 Area Manager Plan, an Area Manager "must [have] be[en] employed by [Wells Fargo] or an affiliate on December 31 to be considered for the [Volume Override True-Up]." (*Id.* at 2.)

On June 21, 2009, Wells Fargo amended the 2009 Area Manager Plan. (*See* Aff. of Steven Cooper in Further Supp. of Mot. for J. on the Pleadings ("Cooper Supp. Aff.") Ex. A.) The amendment, *inter alia*, increased the per loan year-to-date NOI threshold separating Column A rates from Column B rates, adjusted calculations for NOI Bonuses, reduced the compensation levels for NOI Bonuses and Overrides on profits and volume over certain levels, and recalculated some loan payments and profits. (*See id.* at 2.)

On July 24, 2009, Wells Fargo terminated Bader for reasons that remain unclear.[1] (Bader Compl. ¶ 77.)  Prior to that time, branches under Bader's management had generated $10,934,333 in NOI—$7,934,333 from January 1 through June 30 and $3 million from July 1 through July 23.  (*Id.* ¶¶ 52-53.)  Bader alleges that he is entitled to an NOI Bonus equal to six percent of that NOI, less a "draw" of $48,000 he had made in April 2009, or roughly $608,060.  (*Id.* ¶ 54.)  In addition, Bader alleges that he is entitled to an NOI Bonus equal to six percent of approximately $5 million in mortgages in the "pipeline" at the time of his termination, or roughly $300,000.  (*Id.* ¶ 54.)  Thus Bader alleges that he is entitled to an NOI Bonus of $908,060.  (*Id.* ¶ 55.)  Bader has not been paid any of that sum.

From January 1 to July 23, 2009, branches under Bader's management generated over $1 billion in volume, $328,188,000 of it in June.  (*Id.* ¶¶ 56-57.)  Bader alleges that he is entitled to a Volume Override equal to two basis points, or .002%, of the June volume, or $65,637.60 but was only paid $32,818.80 due to "Wells Fargo's administrative serial failures, [and] significant and unprecedented delays in processing loans, causing them to close after Wells Fargo's unilateral change in Bader's compensation in June 2009."  (*Id.* ¶ 58.)  From July 1 through July 23, 2009, Bader's branches generated $320,370,195.80 in volume.  Bader alleges that he was entitled to a Volume Override equal to two basis points of that volume, or $64,074 but was paid only $32,037.  (*Id.* ¶¶ 59-60.)  Bader also alleges that, "as of the date of his termination . . . there were loans in Bader's locked loan pipeline to be closed within the year totaling approximately $680 million, entitling Bader to $136,000 in Volume Override Bonus

---

[1] Bader does not challenge his status as an employee-at-will or allege that his termination was unlawful.

compensation." (*Id.* ¶ 61.)  Thus Bader alleges that he is entitled to $200,855 in Volume Overrides—$32,818.80 of an unpaid June Volume Override, $32,037 of an unpaid July Volume Override, and $136,000 of Volume Overrides on loans waiting to be closed at the time of his termination.  (*Id.* ¶ 62.)  Finally, Bader alleges that that he "is entitled to an Override True-Up for January 2009 equaling $21,000." (*Id.* ¶¶ 63-64.)  Wells Fargo has not paid Bader any of these sums.

### B.  Auerbach

Auerbach joined Wells Fargo as a "private mortgage banker" on November 13, 2003.  (Auerbach Compl. ¶ 23.)  In 2004, Auerbach's managers reported that he had performed "significantly above all key targets" and was "proactive" and a "very valuable asset to the organization." (*Id.* ¶¶ 25-30.)   In 2005, Auerbach was promoted to Sales Manager in the New York office and again received very positive reviews.  (*Id.* ¶ 32.)  His managers reported that his skills "exceed[ed] the company average", that he had "finished the year significantly above the company averages"; and that he had "done an outstanding job" and a "[g]reat [j]ob." (*Id.* ¶¶ 33-38.)  Likewise, in 2006 and 2007, Auerbach's managers reported that he "ha[d] done an excellent job growing and managing his team"; that he was "making continuous progress in establishing himself as a respected leader in the office"; that he had become "the ultimate leader"; that he was the only person in the office to have received the highest possible underwriter authority for a mortgage originator; and that he was "one of the best" and "most accomplished underwriters in [the] office." (*Id.* ¶¶ 40-53.)  And in 2008, Auerbach's managers reported that Auerbach was "a spiritual leader [at an] amazing successful branch"; that he "continue[d] to do all the right things"; that he was "a magician at driving productivity";

and that he functioned as a "quarterback" for the Manhattan branch's nation-leading results. (*Id.* ¶¶ 58-61.)  Indeed, in 2008, the Manhattan branch was awarded President's Club status as the second most profitable branch in America. (*Id.* ¶ 86.)

Under the Wells Fargo Home Mortgage 2009 Incentive Compensation Plan for Private Mortgage Banking Branch Sales Manager ("2009 Branch Manager Plan") (*see* Aff. of Steven Cooper in Supp. of Def.'s Mot. to Dismiss (Cooper Auerbach Aff. Ex. B.), which was effective April 1, 2009, a President's Club addendum thereto (*see* Cooper Auerbach Aff. Ex. C.), and a Partner Bonus Plan effective January 1, 2008 (*see* Cooper Auerbach Aff. Ex. D), Auerbach was eligible for several kinds of incentive compensation, including (1) an NOI Bonus; (2) a Volume Override; (3) a Volume Override True-Up; (4) commissions; (5) a President's Club bonus; and (6) a partnership bonus.  (*See id.* ¶ 65.)  The 2009 Branch Manager Plan provided that it was "subject to change at any time during the Plan Year at [Wells Fargo's] complete discretion." (Cooper Auerbach Aff. Ex. B at 1.)  The President's Club addendum and the Partnership Bonus Plan contained similar provisions.  (*See* Cooper Auerbach Aff. Ex. C; Ex. D at 4.)

Under the 2009 Branch Manager Plan, a Branch Manager was eligible to earn an NOI Bonus equal to up to 7.5% of his branch's NOI, half of which was paid in the quarter in which it was earned and the other half of which was paid at the beginning of the following calendar year.  (*See* Cooper Auerbach Aff. Ex. B at 14.)  The greater the NOI per loan earned by the branch, the greater the percentage a Branch Manager could earn.  (*See id.*).  Under the 2009 Branch Manager Plan, a Branch Manager "must [have] be[en] employed by Wells Fargo Home Mortgage or an affiliate on March 31, June 30, September 30 and December 31 to be considered for the [quarterly NOI Bonus]."  (*Id.*)

A Branch Manager was also eligible to earn monthly Volume Overrides equal to a percentage of the loan volume funded by his branch in a given month.  As with the 2009 Area Manager Plan, the 2009 Branch Manager Plan provided that the more employees under the Branch Manager's management and the greater the year-to-date NOI the branch earned, the greater the percentage Branch Managers could earn.  (*Id.* at 12.)   Branch Manager Volume Overrides, too, were paid at Column A and Column B rates depending on whether the NOI per loan was less than, equal to or greater than $1,500 per loan.  (*Id.*)  The 2009 Branch Manager Plan also specifically addressed how Volume Overrides would be paid in the event that an Branch Manager was terminated: "Payment of the standard monthly volume override . . . shall be based upon eligible loans that fund on or before the date of the Employee's termination."  (*Id.* at 15.)  Branch Managers could also benefit from a "Volume Override True-Up" that was operated in the same way as the Volume Override True-Up under the 2009 Area Manager Plan described above.  As with the 2009 Area Manager Plan, a Branch Manager "must [have] be[en] employed by [Wells Fargo Home Mortgage] or an affiliate on December 31 to be considered for the [Volume Override True-Up]."  (*Id.*)

Unlike Area Managers, Branch Managers were also eligible for commissions calculated using an extensively detailed formula.  It suffices for disposition of this motion to note that the commissions were based on monthly loan volume and the number of loans with special characteristics.  The 2009 Branch Manager Plan provided that "full commission credit according to the applicable commission schedule will be earned for loans which fund within thirty (30) days after termination of employment, or in accordance with state law."  (*Id.* at 15.)  However, the plan also provided that "if [a

Branch Manager] engages in misconduct, a [Branch Manager] will not be eligible to earn monthly commission credit on loans which fund within thirty (30) days of the date of termination of employment." (*Id.*)

Branch Managers who, like Auerbach, had been awarded President's Club status during 2009 based on "performance during the 2007 Plan Year" were also eligible for additional incentive compensation of up to five basis points of the loan volume funded by their employees. (*See* Cooper Auerbach Aff. Ex. C.)

Branch Managers were also eligible to earn additional incentive compensation pursuant to the Partner Bonus Plan applicable from 2008 through 2010. Under the Partner Bonus Plan, Branch Managers who achieved specified levels of customer satisfaction and generated at least $360,000 of net revenue in 2008 were eligible to receive "points" equal to two percent of net revenue. (*See* Cooper Auerbach Aff. Ex. D. at 3.) Branch Managers employed on December 31, 2008 were eligible to receive a bonus equal to 33% of the "points" awarded, with $1 for every point. (*See id.*) Branch Managers employed on December 31, 2009 and who had generated at least $100,000 in net revenue on funded loans in 2009 were eligible to receive a bonus calculated in the same manner. (*See id.*) The Partner Bonus Plan provided that "[i]f, between January 1, 2009 and December 31, 2010, [a Branch Manager] voluntarily or involuntarily terminates employment with [Wells Fargo] for a reason other than [death, retirement, or a qualifying event under the Salary Continuation Pay Plan in effect at the time of termination (Cooper Auerbach Aff. Ex. E)] . . . [the Branch Manager] forfeits all Points remaining at the time of termination and no further bonus is due." (Cooper Auerbach Aff. Ex. D. at 5.)

Auerbach was terminated on July 23, 2009 for reasons that are not entirely clear. (Auerbach Compl. ¶ 101.)  Auerbach alleges that he was terminated "without cause" and therefore is entitled to severance pay equal to "six (6) months of compensation and benefits continuation", or $300,000.[2]  (*Id.* ¶ 15.)  Wells Fargo argues that Auerbach was terminated for cause, but in any event is not entitled to severance under the terms of Wells Fargo's Salary Continuation Plan.  (Wells Fargo Auerbach Opp'n at 3 n.2.)

Prior to his termination, Auerbach's branch generated $3,629,694 in NOI.  (*Id.* ¶ 66.)  Auerbach alleges that he is entitled to an NOI Bonus equal to 3.75% of that NOI (because he split the 7.5% with his co-manager), or $136,114.  (*Id.* ¶ 67.)  In addition, Auerbach alleges that he is entitled to 3.75% of an unspecified amount in NOI to be earned from loans in the "pipeline", or $75,821.  (*Id.* ¶ 68.)  Thus Auerbach alleges that he is entitled to an NOI Bonus of $211,935.  (*Id.* ¶ 69.)  Wells Fargo has not paid Auerbach any of that sum.

From January 1 to June 30, 2009, Auerbach's branch generated $881,975,744 in loan volume.  (*Id.* ¶70.)  Assuming (a) that eighty percent of the branch's employees reported directly to Auerbach, (b) that these employees' generated exactly eighty percent of the branch's loan volume, or $539,405,044, and (c) that Auerbach qualified for a Volume Override equal to 2.5 basis points of that volume (because he shared give basis points with his co-manager), Auerbach alleges that he is entitled to Volume Overrides equal to $134,851.  (*Id.* ¶ 71.)   Applying the same assumptions, Auerbach also alleges that he is entitled to a Volume Override for July volume equal to $41,543 and, assuming that eighty-five percent of loans in the pipeline would ultimately close, Volume

---

[2] While Auerbach claims that he was terminated without cause, he is not seeking compensation for unlawful termination.

Overrides for pipeline volume equal to $89,862.  (*Id.* ¶¶ 72-73.)[3]  Wells Fargo has paid Auerbach only $83,025 in Volume Overrides for 2009, leaving $183,232 unpaid by his calculations.  (*Id.* ¶¶ 74-75.)

Auerbach also alleges that he is entitled to $169,000 in unpaid commissions: $10,000 from "loans that were locked incorrectly and/or had exorbitant extensions" through no fault of his own; $15,000 from "loans that were not paid due to intentional delays by Wells Fargo"; $104,000 from some $16 million in loans in the pipeline as of July 23, 2009 that were to close within the year; and $40,000 from a $3.4 million loan to one Harvey Ross, a commission which Auerbach alleges he was "guarantee[d]" he would be paid.  (*Id.* ¶¶ 76-80.)

In 2008, Auerbach's branch achieved President's Club status.  (*Id.* ¶ 86.) Accordingly, as Branch Manager, Auerbach was eligible for a President's Bonus equal to additional commission credit in the form of an additional 2.5 basis points of his branch's loan volume, or $4,000, and the same basis points of some $16 million in "locked pipeline", or another $4,000.  (*Id.* ¶¶ 88-89.)  Wells Fargo has never paid Auerbach any of either sum.  Finally, Auerbach alleges that he is entitled to $25,000 in unpaid Partnership Bonus compensation.  (*Id.* ¶ 93.)[4]

---

[3] Auerbach nowhere attempts to provide support for any of these assumptions.  That may pose an obstacle to showing the amount of any bonus that Auerbach might be due. However, it is not necessary to analyze Auerbach's assumptions in disposing of this motion for the purposes of which the assumptions are taken as true.

[4] Auerbach also alleges that is owed $1,385 in unpaid expenses.  (*See* Auerbach Compl. at ¶¶ 95-100.)  Wells Fargo does not appear to move for dismissal of that claim.

### C.  Procedural History

Bader brought suit in New York Supreme Court, New York County on October 21, 2009.  Wells Fargo filed a notice [1] of removal to this Court on November 12, 2009 and filed an answer [5] in this Court on November 30, 2009.  On June 30, 2010, Wells Fargo moved [13] for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

Auerbach filed his suit in New York Supreme Court, New York County on February 24, 2010.  Wells Fargo filed a notice [1] of removal to this Court on March 26, 2010.  On July 6, 2010, Wells Fargo moved [12] to dismiss Auerbach's compliant under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief can be granted.

### LEGAL STANDARD

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim."  *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).  Thus the Court applies the same standard to both Wells Fargo's motion for judgment on Bader's complaint on the pleadings and Wells Fargo's motion to dismiss Auerbach's complaint. "In both postures, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor."  *Id.*

However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and courts are "not bound to accept as true a legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Id.* at 1949.  Rather,

"[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.*  "Where a complaint pleads

facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line

between possibility and plausibility of 'entitlement to relief.'" *Id.*  (quoting *Twombly*,

550 U.S. at 557).

The Court is "not limited solely to the allegations in the complaint, however.

Where a plaintiff has relied on the terms and effect of a document in drafting the

complaint, and that document is thus integral to the complaint, [a court] may consider its

contents even if it is not formally incorporated by reference." *Broder v. Cablevision Sys.*

*Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (quotation marks omitted).  Indeed, "where the

claim is for breach of contract, the complaint is deemed to incorporate the contract by

reference because the contract is integral to the plaintiffs' claim." *Verzani v. Costco*

*Wholesale Corp.*, 641 F. Supp. 2d  291, 297-98 (S.D.N.Y. 2009) ; *see also Assoko v. City*

*of New York*, 539 F. Supp. 2d 728, 732 n. 1 (S.D.N.Y. 2008) (same); *Berman v. Sugo*

*LLC*, 580 F. Supp. 2d 191, 201 (S.D.N.Y. 1998) ("The unsigned Operating Agreement . .

. is also within the scope of the Court's review on this motion to dismiss because it is

incorporated into the Counterclaims by reference or through [plaintiffs'] reliance in

making their allegations.").  A plaintiff "cannot avoid the Court's consideration of [a]

document simply by failing to explicitly reference it . . . ." *RBS Holdings, Inc. v. Wells*

*Fargo Century, Inc.*, 485 F. Supp. 2d 472, 477 (S.D.N.Y.  2007) (citing *Yak v. Bank Brussels Lambert, BBL*, 252 F.3d 127, 130 (2d Cir. 2001) ("Carefully avoiding all mention of the Consulting Agreements does not make them any less integral to her complaint.")).

Here, neither Bader nor Auerbach explicitly mentions several agreements that Wells Fargo has attached to its briefs and neither plaintiff formally incorporates any of these agreements by reference.  However, both Bader and Auerbach do refer to "express written agreements" and "written schedules" and calculate the bonuses allegedly owed them using figures that seem drawn from the agreements Wells Fargo has attached.  (*See* Bader Compl. ¶¶ 7, 9, 11, 41, 43, 52-64, 88; Auerbach Compl. ¶¶ 5, 7, 9, 11, 13, 65, 67-76, 87-88, 93, 113.)  Accordingly, those agreements are properly considered on Wells Fargo's motion for judgment on the pleadings and on Wells Fargo's motion to dismiss.[5]

## DISCUSSION

Plaintiffs allege four claims sounding in contract: breach of contract, breach of implied contract, quantum meruit, and promissory estoppel.  The court first considers

---

[5] Bader contends he has "allege[d] that the Plan did not come into existence until June 2009" and that "there is no proof *when* the Plan was implemented and no supporting affidavit authenticating the terms of the Plan or its application."  (Bader Opp'n at 11 (emphasis in original).)  That argument is meritless.  As an initial matter, Bader's complaint seems wholly bereft of any allegation that his incentive compensation plan did not come into effect until June 2009.  Bader merely alleges that Wells Fargo *amended* his compensation plan in June 2009.  (Bader Compl. ¶¶ 66-76.)  That allegation itself suggests that some prior plan was in effect.  Moreover, Bader is simply wrong that Wells Fargo has not filed a supporting affidavit authenticating the copy of the 2009 Area Manager Plan attached to its brief.  Wells Fargo filed an affidavit in which its counsel swore that he had attached "a true and correct copy of the Wells Fargo Home Mortgage 2009 Incentive Compensation Plan for Area Sales Managers."  (Cooper Bader Aff. ¶ 3.)  Unless Bader wishes to allege that counsel has filed a fraudulent document with the Court, Bader cannot evade the terms of the very compensation plan on which he has brought suit.

Plaintiffs' breach of contract and breach of implied contract claims and then turns to consider Plaintiffs' quantum meruit and promissory estoppel claims. Finally, the Court will consider Plaintiffs' claim under the New York Labor Law.

### A.  Breach of Contract

"It is well established under New York law that '[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan.'"  *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 397 (S.D.N.Y. 2001) (quoting *Hall v. United Parcel Serv. of Am., Inc.,* 555273, 279 (N.Y. 1990)).  Thus "entitlement to a bonus only exists where the terms of the relevant contract require it."  *Vetromile v. JPI Partners, LLC*, 706 F. Supp. 2d 442, 448 (S.D.N.Y. 2010).  "New York Courts have repeatedly upheld, as a valid condition precedent, an employer's requirement that an employee be employed through a certain time period."  *Berardi v. Fundamental Brokers, Inc.*, Nos. 89-CV-5143, 90-CV-646, 1990 WL 129174, at *15 (S.D.N.Y. Aug. 30, 1990).  *See also, e.g.*, *Truelove v. Ne. Capital & Advisory, Inc.*, 738 N.E.2d 770 (N.Y. 2000) (holding that "[b]ecause plaintiff resigned shortly after he received his first quarterly payment, he was not entitled to receive the remaining three payments" where "the bonus plan explicitly predicated the continuation of bonus payments upon the recipient's continued employment status"); *Johnson v. Stanfield Capital Partners, LLC*, 891 N.Y.S.2d 383, 384-85 (1st Dep't 2009) (finding that "the clear terms of the employment agreement preclude plaintiff from receiving any bonus, which was only determined at year-end, for the year 2006" where compensation plan stated that an employee "must be employed on the bonus payment date for that year" and plaintiff's "employment with defendant ended in March 2006");; *Bayer v. Oxford Univ. Press,* 61 N.Y.S.2d 209, 210-11 (1st Dep't 1946) ("Since plaintiff

was not in the active employ of the defendant on March 15, 1944, as required by the

bonus plan adopted by the defendant, he acquired no bonus rights.").

Indeed, "where the relevant bonus policy requires employment through a certain

date and the employee was discharged before that date, the employee does not have a

valid claim to the bonus." *Welland v. Citigroup, Inc.*, No. 00-CV-738, 2003 WL

22973574, at *15 (S.D.N.Y. Dec. 17, 2003) (holding that "plaintiff has no enforceable

right in a bonus" where "Citigroup's bonus policy (1) clearly provides that bonuses

awarded pursuant to the policy are discretionary and (2) precludes payment of a bonus for

any year during which an employee is not actively employed on December 31 of the year

at issue").  *See also Ireton-Hewitt v. Champion Home Builders Co.*, 501 F. Supp. 2d 341,

355 (N.D.N.Y. 2007) (holding that "plaintiff did not satisfy the bonus policy eligibility

requirements, and defendant did not breach its bonus policy" where "the bonus plan"

stated that "the employee must hold the position at fiscal year end 2003 and be on the

active payroll at the time the bonuses are actually paid" and plaintiff "was not on the

active payroll when Champion paid the bonuses");  *Anderson v. Sotheby's, Inc.*, No. 04-

CV-8180, 2006 WL 1722576, at *20 (S.D.N.Y. June 22, 2006) ("Anderson's continuing

employment at SIR at year-end was an implied condition precedent to receiving a bonus.

Anderson failed to meet that condition in 2004, as he was terminated on February 17,

2004. . . . As a result, he is not entitled to a bonus for work performed at SIR in 2004.");

*Criscuolo v. Joseph E. Seagram & Sons, Inc.*, No. 02-CV-1302, 2003 WL 22415753, at

*11 (S.D.N.Y. Oct. 21, 2003) ("Criscuolo's contractual claim therefore fails because he

failed to fulfill the condition on which Vivendi offered the enhanced bonus:  that he

remain with Vivendi until the closing date."); *O'Dell*, 153 F. Supp. 2d at 397 (holding

16

that because plaintiff "was not employed on the date that the award checks were issued, she is not entitled to a year-end bonus" where the "Bonus Program explicitly provide[d] that to be eligible for a year-end award payout, the employee 'must be employed on the date that the award checks are issued'").[6]

### 1.  Bader's Contract Claims

#### a.  NOI Bonus

Bader alleges that he is entitled to an NOI Bonus of $908,060.  (Bader Compl. ¶ 55.)  However, the 2009 Area Manager Plan provided that an Area Manager "must [have] be[en] employed by [Wells Fargo] or an affiliate on December 31, 2009 to be considered for an Annual Net Income Bonus . . . ."  (Cooper Bader Aff. Ex. B at 4.) Since Bader was terminated on July 24, 2009—prior to December 31, 2009—he could not have fulfilled the condition precedent to receiving his NOI Bonus.  Accordingly, his breach of contract claim for that bonus is dismissed.

#### b.  Volume Override

Bader alleges that he is entitled to $200,855 in Volume Overrides—$32,818.80 of an unpaid June Volume Override, $32,037 of an unpaid July Volume Override, and $136,000 of Volume Overrides on loans waiting to be closed at the time of his termination.  (Bader Compl. ¶ 62.)  As noted above, the 2009 Area Manager Plan

---

[6] Both Bader and Auerbach argue that restrictions on the payment of the bonuses they claim are unenforceable because those bonuses are wages under the New York Labor Law.  (*See* Bader Opp'n at 11-13; Auerbach Opp'n at 14-16.)  It is true that "if the incentive [bonus] compensation payments were payments of earned wages, a plaintiff could not contract to forfeit them." *Weiner v. Diebold Group, Inc.,* 568 N.Y.S.2d 959, 961 (1st Dep't 1991).  As discussed *infra,* however, the bonuses for which the Court holds that Bader and Auerbach cannot recover are not "wages" under the New York Labor Law.   Accordingly, Bader and Auerbach's arguments based on the contrary premise are unpersuasive.

specifically addressed how Volume Overrides would be paid in the event that an Area Manager was terminated.  The Plan provided as follows: "Payment of the standard monthly volume override . . . shall be based upon eligible loans that fund on or before the date of the Employee's termination.  [An Area Manager] shall not receive any volume override on loans that fund after the Employee's date of termination."  (Cooper Bader Aff. Ex. B at 7.)  The Court finds that this provision establishes the requirement that a loan "fund" prior to Bader's termination as a condition precedent for receiving a Volume Override based on that loan.  *Cf. Grey v. Goldome*, No. 88-CV-7452, 1995 WL 422265 (S.D.N.Y July 17, 1995) (finding that where a compensation agreement provided that "plaintiff was not entitled to receive any [deferred incentive payments] unless consideration was 'actually received ... during [plaintiff'] initial nine month employment term,'" the plaintiff could not recover any incentive payments allegedly owed based on transactions for which employer received consideration after the employment term).  Accordingly, the Court finds that Bader's contract claim for a "Volume Override Bonus" must be dismissed to the extent that Bader seeks loans that did not "fund" prior to July 24, 2009.

However, determining what loans did "fund" prior to that date is another matter.  Wells Fargo argues that Bader "is not entitled to any Volume Override Bonus because Bader is seeking loans funded at the end of the year, when the Plan states the loans must be funded by the employee's termination date."  (Wells Fargo Bader Br. at 11.)   The 2009 Area Manager Plan does not define "fund."  But the plain meaning of that term is "[t]o furnish money to (an individual, entity, or venture), esp[ecially] to finance a particular project."  Black's L. Dict. (9th ed.).  Consistent with that definition, Wells

Fargo states that the Volume Override "applies only to loans which are funded (*i.e.* were paid out) prior to the employee's termination." (Wells Fargo Bader Br. at 11.)   Applying that definition, the loans in the pipeline as of July 24, 2009 that Bader alleges were "to be closed within the year" did not "fund" prior to Bader's termination since a bank does not fund loans which have not closed.  Wells Fargo is therefore entitled to judgment on Bader's claim for Volume Overrides based on loans in the pipeline.

Yet Wells Fargo provides no support for its claim that the loans that Bader alleges were part of his area's "closing volume" in June and July (*see* Bader Compl. ¶¶ 56-59) were not "paid out" until "the end of the year."[7]  Since the Court must draw all inferences in Bader's favor, *see Patel*, 259 F.3d at 126, the Court cannot conclude as a matter of law that Bader is not entitled to any bonus compensation for loans that he alleges were part of his area's June and July volume.  Accordingly, Wells Fargo's motion for judgment on the pleadings is denied to the extent that Bader can show that he has not been paid bonuses for loans, other than loans in the pipeline, that were funded before his termination.[8]

---

[7] Indeed, Wells Fargo seems to acknowledge this distinction given that it seeks dismissal of Auerbach's claim to Volume Overrides only to the extent that such bonuses are based on loans in the pipeline.  (*See* Wells Fargo Auerbach Br. at 5.)

[8] To the extent that Bader and Auerbach allege that loans funded after their termination due to Wells Fargo's intentional delay (*see* Bader Compl. ¶ 58; Auerbach Compl. ¶ 74), those allegations are wholly conclusory and need not be taken as true for disposition of these motions.  *See Iqbal*, 129 S. Ct. at 1949-50.  *Cf. Grey v. Fed. Deposit Ins. Co.*, No. 88-CV-7452, 1998 WL 483460, at *16 (S.D.N.Y. Aug. 14, 1998) (holding that, although "defendant was obligated not to intentionally frustrate plaintiff's efforts" to meet a performance threshold "in an attempt to deprive plaintiff of threshold credit," the plaintiff "has not demonstrated that defendant intentionally interfered with his ability to satisfy the threshold, and his conclusory allegations that defendant acted in bad faith will not effect a waiver of the threshold requirements").  Neither Bader nor Auerbach point to any facts suggesting why Wells Fargo would forgo loan profits to deny Bader or Auerbach their bonuses.  Accordingly, Bader's and Auerbach's claims for Volume Overrides rise and fall solely on whether the loans were funded prior to their termination.  However, as set forth more fully below, Bader and Auerbach shall have leave to amend their complaints

One further issue requires mention.  Bader appears to allege that his bonuses should be calculated based on the 2009 Area Manager Plan and not based on the June 2009 amendment because the amendment was void.  With respect to loans funded after the June 1, 2009 amendment but prior to his termination, Bader's argument is foreclosed by the terms of the 2009 Area Manager Plan itself which provided that the plan was "subject to change at any time during the Plan Year at [Wells Fargo's] sole discretion" and that Wells Fargo "may modify the annual bonus provisions or any other provisions" of the plan.  (Cooper Bader Aff. Ex. B at 1.)  However, Bader is on stronger ground in arguing that these provisions do "not entitle Wells Fargo to retroactively impose new and different terms that change Bader's entitlements to compensation that was already earned on transactions that were already originated for funded."  (Bader Opp'n at 13.)  Indeed, as Wells Fargo appears to concede (*see* Wells Fargo Bader Reply Br. at 4), the amendment itself provides that it "shall be effective for loans that have fundings June 1, 2009 and after."  (Cooper Bader Reply Aff. at 1.)  Therefore, to the extent that Bader can show an entitlement to bonuses based on loans funded prior to June 1, 2009, such bonuses are governed by the terms of the 2009 Area Manager Plan.  However, to the extent that Bader can show an entitlement to bonuses based on loans funded after June 1, 2009 but before July 24, 2009, such bonuses are governed by the 2009 Area Manager Plan as amended.

### c.  Volume Override True-Up

Bader alleges that that he "is entitled to an Override True-Up for January 2009 equaling $21,000."  (Bader Compl. ¶¶ 63-64.)  However, under the 2009 Area Manager

---

with regard to their allegations that Wells Fargo deliberately prevented the funding of loans that would have resulted in incentive compensation pursuant to the various incentive compensation plans.

Plan, an Area Manager "must [have] be[en] employed by [Wells Fargo] or an affiliate on December 31 to be considered for the [Volume Override True-Up]."  (Cooper Bader Aff. Ex. B at 2.)  Since Bader was terminated on July 24, 2009—prior to December 31, 2009—he could not have fulfilled the condition precedent to receiving a Volume Override True-Up.  Accordingly, his breach of contract claim for that bonus is dismissed.

### 2.  Auerbach's Contract Claims

#### a.  NOI Bonus

Auerbach alleges that he is entitled to an NOI Bonus of $211,935.  (Auerbach Compl. ¶ 69.)  However, the 2009 Branch Manager Plan provided that a Branch Manager "must [have] be[en] employed by [Wells Fargo] or an affiliate on March 31, June 30, September 30 and December 31 to be considered for the [quarterly NOI Bonus]." (Cooper Auerbach Aff. Ex. B at 14.)  Since Auerbach was terminated on July 23, 2009, he was not employed by Wells Fargo Home Mortgage on September 30 or December 31, 2009 and could not have fulfilled the condition precedent to receiving quarterly NOI Bonuses that would be paid after June 30, 2009.   To the extent that Auerbach seeks such bonuses, his breach of contract claim is dismissed.

#### b.  Volume Override

Auerbach alleges that he is entitled to $183,232 in unpaid Volume Overrides for 2009 based on volume generated prior to July 23, 2009 and volume in loans locked in the pipeline at that time.  (*Id.* ¶¶ 74-75.)   Wells Fargo argues that by seeking $89,862 from loans locked in the pipeline as of July 23, 2009, Auerbach has admitted that those loans did not "fund" prior to Auerbach's termination.  (*See* Wells Fargo Auerbach Br. at 5.) For the reasons discussed above with respect to Bader's claim for Volume Overrides on

loans in the pipeline, Auerbach's claim for Volume Overrides based on loans in the pipeline is dismissed.

### c.  Commissions

Auerbach also alleges that he is entitled to $169,000 in unpaid commissions: $10,000 from "loans that were locked incorrectly and/or had exorbitant extensions" through no fault of his own; $15,000 from "loans that were not paid due to intentional delays by Wells Fargo"; $104,000 from some $16 million in loans in the pipeline as of July 23, 2009 that were to close within the year; and $40,000 from a $3.4 million loan to one Harvey Ross, a commission which Auerbach alleges he was "guarantee[d]" he would be paid.  (Auerbach Compl. ¶¶ 76-80.)  Wells Fargo has not moved to dismiss Auerbach's claim for a commission related to the Harvey Ross loan.

Since the same restriction that loans must "fund" applies to both Volume Overrides and commissions, it would seem that Auerbach cannot recover commissions for loans in the pipeline as of July 23, 2009 for the same reason he cannot recover Volume Overrides for loans in the pipeline as of the same date.   But unlike the Volume Override provision, which provides that loans must "fund" prior to the termination date, the provision governing commissions provides that Branch Managers will receive commissions on loans funded up to thirty days *after* the termination date *unless* that termination was for misconduct.  The provision defines misconduct as "(1) violation of statutory, regulatory, or any other compliance requirements applicable to [Wells Fargo's] business activities; (2) a breach of trust or dishonesty; (3) violation of the Code of Ethics; (4) a breach of Employee's Employment Agreement or Trade Secrets Agreement . . . .

and/or (5) brokering loans outside of [Wells Fargo] or one of its affiliates without [Wells Fargo's] knowledge and approval."   (*See* Cooper Auerbach Aff. Ex. B at 15.)

Wells Fargo contends that "Auerbach was terminated for, among other things, misconduct."  (Wells Fargo Auerbach Br. at 6.)  However, Wells Fargo offers nothing to support that contention other than a footnote in its brief which states that "Auerbach was terminated based on concerns related to his management of the office, interactions with team members, the inequitable distribution of work, and his perceived retaliatory and threatening management style."  (*Id.* at 3 n.2.)  Wells Fargo does not specify why these activities fall under the definition of "misconduct" or why they violated any applicable compliance requirements, the Code of Ethics, or Auerbach's employment agreement. Since the Court must give Auerbach every favorable inference, *see Patel*, 259 F.3d at 126, the Court cannot conclude as a matter of law that Auerbach was terminated for misconduct as defined in the 2009 Branch Manager Plan.  Accordingly, the Court cannot determine at this time whether Auerbach is entitled to commissions on loans funded within thirty days after his termination.  It is possible that a loan in the pipeline as of July 23, 2009 could have funded within thirty days after that date.  Wells Fargo's motion to dismiss Auerbach's breach of contract claim for commissions is therefore denied.

### d.  President's Club Bonus

Auerbach also alleges that he is entitled to $8,000 in President's Club bonuses, $4,000 from additional commission credit on his branch's loan volume and the same amount on loans locked in the pipeline.  (Auerbach Compl. ¶¶ 86-89.)  The President's Club addendum to the 2009 Branch Manager Plan provided that "[e]ach provision of [that plan] that is not superseded by this Addendum remains in full force and effect and

applies toward commission credit awarded under this Addendum." (*See* Cooper

Auerbach Aff. Ex. C.)  Thus, as Wells Fargo concedes (*see* Wells Fargo Auerbach Br. at

14), the same provisions discussed above regarding commissions applied to President's

Club bonuses.  And for the same reason that Wells Fargo's motion to dismiss on the basis

of the provision governing commissions is denied, so, too, the motion to dismiss

Auerbach's claim for President's Club bonuses is denied.

### e.  Partnership Bonus

Auerbach alleges that he is entitled to $25,000 in unpaid Partnership Bonus

compensation.  (*Id.* ¶ 93.)  The Partner Bonus Plan provided that "[i]f, between January 1,

2009 and December 31, 2010, [a Branch Manager] voluntarily or involuntarily terminates

employment with [Wells Fargo] for a reason other than described in subparagraph 3

below or the Employee voluntarily transfers to another position within the company not

covered by the Plan, Employee forfeits all Points remaining at the time of termination

and no further bonus is due."  (Cooper Auerbach Aff. Ex. D. at 5.)   Subparagraph 3

listed three reasons for termination:  (1) death; (2) retirement; and (3) "a qualifying event

under Wells Fargo & Company's Salary Continuation Pay Plan in effect at the time of the

event . . . ."  (*Id.*)  Wells Fargo points to a document that its counsel has sworn to be a

"true and correct copy of the Salary Continuation Plan."  (Cooper Auerbach Aff. ¶ 6, Ex.

E.)   However, that document states that it became effective on January 1, 2010 and that

the Salary Continuation Plan was "most recently amended for participants who receive

written notice of a position elimination or substantial position change occurring on or

after January 1, 2010 (the 'effective date')."  (Cooper Auerbach Aff. Ex. E at 1, 12-3.)

Since Auerbach was terminated on July 23, 2009, the document does not seem to be the

severance plan in effect at the time Auerbach was terminated.  The Court therefore cannot determine whether Auerbach was terminated due to a qualifying event under the Salary Continuation Pay Plan in effect at the time of his termination.  Accordingly, the Court cannot conclude as a matter of law that the Partnership Bonus Plan precludes Auerbach's contract claim for a Partnership Bonus.  Wells Fargo's motion to dismiss that claim is therefore denied.

### f.   Severance

Auerbach also alleges that he is entitled to severance pay equal to "six (6) months of compensation and benefits continuation", or $300,000, because he was "terminated "without notice, reason, justification or cause from his employment with Wells Fargo." (Auerbach Compl. ¶¶ 15, 101.)  Wells Fargo argues that, under its Salary Continuation Plan, a discharged employee is not eligible for severance unless the employee's position was eliminated or the employee's position was substantially changed.  (Wells Fargo Auerbach Br. at 8.)  However, as discussed above, Wells Fargo does not appear to have provided the Court with the Salary Continuation Plan in effect at the time Auerbach was terminated.  Accordingly, the Court cannot conclude that the terms of the operative Salary Continuation Plan preclude Auerbach's contract claim for severance as a matter of law.  Wells Fargo's motion to dismiss that claim is therefore denied.

### B.  Breach of Implied Contract

"Under New York law, absent a written agreement between the parties, 'a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct.'" *Bear Stearns Inv. Products, Inc. v. Hitachi Automotive Products (USA), Inc.*, 401 B.R. 598, 615 (S.D.N.Y.

2009) (quoting *Ellis v. Provident Life & Accident Ins. Co.,* 3 F. Supp. 2d 399, 409

(S.D.N.Y. 1998)).  "An implied-in-fact contract is just as binding as an express contract

arising from declared intention, since in law there is no distinction between agreements

made by words and those made by conduct."  *Bear Stearns*, 401 B.R. at 615-16

(quotation marks omitted).  However, "a contract cannot be implied *in fact* where the

facts are inconsistent with its existence . . . or where there is an express contract covering

the subject-matter involved."  *Ludemann Elec., Inc. v. Dickran*, 903 N.Y.S.2d 532, 534

(2d Dep't 2010) (emphasis in original); *see also Valentino v. Davis*, 703 N.Y.S.2d 609,

612 (3d Dep't 2000) ("A contract may not be implied in fact from the conduct of the

parties where it appears that they intended to be bound only by a formal written

agreement.").  Thus "the theories of express contract and of contract implied in fact . . .

are mutually exclusive."  *Bowne of New York, Inc. v. Int'l 800 Telecom Corp.*, 576

N.Y.S.2d 573, 574 (1st Dep't 1991).  Since the 2009 Area Manager Plan and the 2009

Branch Manager Plan are written contracts governing the claims at issue, Bader's and

Auerbach's claims for breach of implied contract must be dismissed.

### C.  Quasi-Contract Claims

Both Bader and Auerbach allege that they are entitled to bonuses under theories of

*quantum meruit* and promissory estoppel.  The Court considers each theory in turn.

### 1.  Quantum Meruit

"Under New York law, a quantum meruit claim is a claim in quasi-contract."

*Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001). "To establish a

quantum meruit claim under New York law, a plaintiff must prove that the defendant was

enriched, that such enrichment was at the plaintiff's expense, and that circumstances were

such that equity and good conscience require that the defendant should compensate the plaintiff." *Id.* at 403. However, "where a valid agreement exists between the parties, an action in quantum meruit to prevent unjust enrichment ordinarily is not available." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 118 (2d Cir. 2006) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.")).

Indeed, "[i]n New York, a plaintiff cannot state a cause of action for quantum meruit where there is a written employment agreement already in place." *Kudaztky v. Galbreath Co.,* No. 96-CV-2693, 1997 WL 598586, at *11 (S.D.N.Y. Sept. 23, 1997); *see also Aledia v. HSH Nordbank AG*, No. 08-CV-4342, 2009 WL 855951, at *3 (S.D.N.Y. Mar. 25, 2009) (dismissing claim for bonus where an employment agreement "addresse[d] the award, vesting, and payment of incentive compensation to Plaintiff"); *Deutsche Asset Mgmt., Inc. v. Callaghan*, No. 01-CV-4426, 2004 WL 758303, at *12 (S.D.N.Y. Apr. 7, 2004) ("Here, the terms of Callaghan's employment and related compensation are covered by enforceable and express contracts between the parties. As such, he may not recover under a theory of unjust enrichment."); *Augienello v. Coast-to-Coast Fin. Corp.*, No. 01-CV-11608, 2002 WL 1822926, at *6 (S.D.N.Y. Aug. 7, 2002) (holding that "the unjust enrichment claim must be dismissed on the merits because plaintiffs' rights to deferred compensation and severance benefits were a subject of their employment contracts"). Here, the 2009 Area Manager Plan and the 2009 Branch Manager Plan govern the bonus compensation to which Bader and Auerbach allege they

are entitled.  Accordingly, Bader's and Auerbach's quantum meruit claims must be dismissed.

## 2.  Promissory Estoppel

"Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract."  *Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 523 (S.D.N.Y. 2009).  "A plaintiff must satisfy four elements to succeed on a promissory-estoppel claim:  (1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced."  *Weinreb v. Hospital for Joint Diseases Orthopaedic Inst.*, 404 F.3d 167, 172 (2d Cir. 2005) (quotation marks omitted).

"Because it is a quasi-contractual claim, however, promissory estoppel generally applies only in the absence of a valid and enforceable contract."  *Kwon v. Yun*, 606 F. Supp. 2d 344, 368 (S.D.N.Y. 2009); *see also Paxi, LLC v. Shiseido Americas Corp.*, 636 F. Supp. 2d 275, 287 (S.D.N.Y. 2009) ("[Promissory estoppel] is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason."); *Holmes v. Lorch*, 329 F. Supp. 2d 516, 527 (S.D.N.Y. 2004) ("Promissory estoppel is a rule applicable only in the absence of an enforceable contract.") (quotation marks omitted).  "When an enforceable contract does exist, the parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract."  *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 759 F. Supp. 1004, 1011 (S.D.N.Y. 1991).  That is because "where the terms of an unambiguous contract are inconsistent with the statements that form the basis of the

claim, the claiming party could not have *reasonably* relied on those statements as a matter of law." *Randolph Equities LLC*, 648 F. Supp. 2d at 524 (emphasis in original and quotation marks omitted); *see also Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp. 2d 263, 272 (S.D.N.Y. 2000) ("The representations relied upon are also inconsistent with the Employment Agreement in that plaintiff asserts that he was told that he would receive a bonus of sixty to one hundred percent of his salary, whereas the Employment Agreement states that a bonus is in the discretion of the Board of Directors."); *Kaplan v. Capital Co. of Am. LLC,* 747 N.Y.S.2d 504, 506 (1st Dep't 2002) ("Plaintiff's remaining claims . . . to recover on theories of . . . promissory estoppel are all without merit.  Given the circumstance that plaintiff had no contractual right to a bonus and was clearly apprised of, and acknowledged in writing that he understood, the company policy that the payment of bonus compensation was purely discretionary, none of these theories is viable.").

That is true in both of these cases.  Both the 2009 Area Manager Plan and the 2009 Branch Manager Plan comprehensively detailed the methodology for what bonuses, if any, Bader and Auerbach would earn.  Those plans condition many of the bonus payments at issue here on the fulfillment of various conditions.  Accordingly, Bader's and Auerbach's allegations of any unconditional oral promises to pay bonuses contradict the express terms of the written agreements governing their incentive compensation.  As such, they could not have reasonably relied on any unconditional oral promises to make bonus payments.  Their claims for promissory estoppel must therefore be dismissed.

### D.  Labor Law Claims

Both Bader and Auerbach also allege claims under Section 193 of the New York Labor Law which prohibits deductions from wages with some exceptions not applicable

here.  Indeed, that provision embodies New York's "long standing policy against the forfeiture of earned wages."  *Mirchel v. RMJ Sec. Corp.,* 613 N.Y.S.2d 876, 878 (1st Dep't 1994); *see also Weiner v. Diebold Group*, 568 N.Y.S.2d 959, 961 (1st Dep't 1991) (same).  However, the New York Court of Appeals has clearly held that Section 193 applies only to wages and not to any compensation paid to an employee.  *See Huddas v. Frito-Lay, Inc.,* 683 N.E.2d 322, 90 N.Y.2d 342, 348 (1997).  The question, then, is whether the bonuses to which Bader and Auerbach allege they are entitled are in fact "earned wages."

"New York courts have held that the issue of 'whether unpaid compensation constitutes a discretionary bonus or nonforfeitable earned wages is a question of fact.'" *Ferrand v. Credit Lyonnais*, No. 02-CV-5191, 2003 WL 22251313, at *12 (S.D.N.Y. Sept. 30, 2003) (citing *Kaplan,* 747 N.Y.S.2d at 505).  "However, where an employee's contract either leaves the bonus in the employer's discretion or conditions it on an event that has not occurred, such as employment through a specific date, courts have decided such questions as a matter of law."  *Vertromile*, 706 F. Supp. 2d at 449.

Section 190 of the Labor Law defines "wages" as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis."  N.Y. Labor Law § 190(1).  "Courts have construed this statutory definition as excluding certain forms of 'incentive compensation' that are more in the nature of a profit-sharing arrangement and are both contingent and dependent, at least in part, on the financial success of the business enterprise."  *Truelove*, 95 N.Y.2d at 223-24; *see also Dean Witter Reynolds, Inc. v. Ross*, 429 N.Y.S.2d 653, 658 (1st Dep't 1980) ("The term 'wages,' despite its broad definition does not encompass an

incentive compensation plan.").  Rather, the statute "contemplates a more direct relationship between an employee's own performance and the compensation to which that employee is entitled" such that "a share in a reward to all employees for the success of the employer's entrepreneurship[] falls outside the protection of the statute."  *Truelove*, 95 N.Y.2d at 224.  Thus "the courts appear to conclude that if an employee has a fixed method of compensation by salary, bonus, commission or otherwise, and additional compensation is dependent on a factor outside the employee['s] actual work, then such compensation is not wages but merely incentive or supplemental compensation." *Samuels v. Thomas Crimmins Contracting Co.*, No. 91-CV-6657, 1993 WL 36168, at *7 (S.D.N.Y. Feb. 9, 1993) (Sotomayor, J.).

This case presents a somewhat close question.  On the one hand, the bonuses for which Bader and Auerbach were eligible depended on the NOI and volume generated not by them alone but by branches—and therefore other individuals—under their management.  Thus Bader and Auerbach each "had a fixed salary and received incentive compensation based not on his performance, but on the performance of his entire department."  *Samuels*, 1993 WL 36168, at *7 (citing *Dean Witter Reynolds, Inc.*, 429 N.Y.S.2d at 658).  Several New York courts have found that factor important in determining that compensation tied to the performance of a group or department is not wages under the New York Labor Law.  *See, e.g.*, *Duffy v. RMSCO, Inc.,* 825 N.Y.S.2d 861(4th Dep't 2006) (finding that the "terms of the bonus plan conclusively establish that the bonus was dependent, at least in part, on the financial success of defendant, and the bonus therefore did not constitute a wage within the meaning of Labor Law § 190") (quotation marks omitted); *Dean Witter Reynolds, Inc.*, 429 N.Y.S.2d at 658; *Int'l Paper*

*Co. v. Suwyn*, 978 F. Supp. 506, 514 (S.D.N.Y. 1997) (dismissing Section 193 claim for bonus that "was triggered only if a specified level of net after-tax earnings and predetermined nonfinancial targets [we]re achieved by the company" and was not "based on [plaintiff's] own performance").

However, the very fact that Wells Fargo tied managers' compensation to the performance of their branches suggests that Wells Fargo believed that the performance of a branch was a reflection of the performance of its manager.  At least one court in this Circuit has found that compensation can be wages even where it is tied to indicators that are dependent in part but not entirely on an employee's performance.  *See Farricker v. Penson Dev., Inc.*, No. 07-CV-11191, 2009 WL 860239, at *8 (S.D.N.Y. Mar. 31, 2009) (payments in addition to base salary based on deals consummated by defendant firm "were clearly tied to Plaintiff's individual performance, as Plaintiff's duties consisted of identifying potential Deals and working to consummate them" and "the Written Agreement clearly laid out the circumstances under which [the bonuses] were to be paid; both how much and when, and did not involve management discretion so as to render them incentive compensation").  *See also Schutty v. Pino*, No. 95-CV-1526, 1997 WL 363812, at *3 (S.D.N.Y. July 1, 1997) (holding that bonus was wages where "bonus was to be determined by a fixed formula based upon the gross fees earned by the firm for that year" and "the amount of that bonus, and the date it was to be paid, were not within [the defendant's] discretion").

In the circumstances of this case, however, the Court need not resolve the extent to which Bader's and Auerbach's bonuses were tied to their own performance.  Under New York law, "the term wages does not include bonus, profit-sharing, and other forms

of incentive compensation unless the incentive compensation is already 'earned' by the employee." *Koss v. Wackenhut Corp.*, 704 F. Supp. 2d 362, 369 (S.D.N.Y. 2010).  "A bonus is 'earned' when the employee acquires a vested interest in the award and its payment is not conditioned upon some occurrence or left to the discretion of the employer." *Id. Cf. Pachter v. Bernard Hodes Group, Inc.*, 891 N.E.2d 279, 285 (N.Y. 2008)  ("[W]hen a commission is "earned" and becomes a "wage" for purposes of Labor Law article 6 is regulated by the parties' express or implied agreement.").  Accordingly, courts have held that compensation conditioned on an employee's remaining employed as of a certain date or the occurrence of some other event is not wages.  *See, e.g.*, *Koss*, 704 F. Supp. 2d at 369 (plaintiffs "did not 'earn' their bonus" where "payment of the Stay Bonus was conditioned upon the employees applying for, and being denied, a position at Entergy" but "these conditions were not fulfilled"); *Criscuolo*, 2003 WL 22415753, at *11 & n.11; *Allison v. Fundamental Brokers, Inc.*, No. 90-CV-4305, 1991 WL 51081, at *7 (S.D.N.Y. Apr. 3, 1991) (holding that, where bonus "letter expressly conditioned receipt of each bonus installment upon plaintiff's employment on the payment date", "plaintiff has no claim for his 1988-89 bonus based on . . . an implied contract" and therefore "no violation of New York's Labor Law could have occurred with respect to those claims").  *Cf. Westheim v. Elkay Indus., Inc.,* 560 N.Y.S.2d 779, 780 (1st Dep't 1990) (affirming verdict for plaintiff on claim for bonuses where evidence showed that "defendant established a nondiscretionary bonus plan which did not condition receipt of the bonus on remaining employed until the end of a season").  *But see Aledia*, 2009 WL 855951, at *3 (denying motion to dismiss Section 193 claim where bonus plan generally conditioned "payment upon Defendant's discretion and Plaintiff's continued employment

with Defendant" but "d[i]d not state definitively when the amounts awarded under the incentive compensation program became vested").

As discussed above, the NOI Bonuses were conditioned on employment at the end of a given period.  Accordingly, those bonuses were not "wages."   The same is true with respect to the Volume Overrides.  Considered in isolation, the Volume Overrides were conditional only upon loans having funded as of the termination date.  As such, the Volume Overrides for any loans that Bader or Auerbach can show had funded prior to the termination date would appear to be wages.  However, considered more broadly, the Volume Overrides were conditional on the Volume Override True-Ups, since a manager of a branch or an area whose NOI fell below the given threshold at the end of the year would incur a deficit in any Column A Volume Overrides already earned.  "Where a compensation plan provides that incentive compensation is not earned until the end of a production period—when appropriate adjustments can be made to calculate the 'net figure[s]' to which employees are entitled—the incentive compensation does not vest, and thus does not qualify as 'wages,' until after the amounts due are determined."  *Levy v. Verizon Info. Serv., Inc.*, 498 F. Supp. 2d 586, 601 (E.D.N.Y. 2007) (finding Section 193 inapplicable where "[a]dvanced compensation [wa]s . . . 'subject to true-up and true-down and reconciliation with earned incentive compensation'"); *see also Dean Witter Reynolds, Inc.*, 429 N.Y.S.2d at 658 (holding that "Costello had no vested interest in the additional compensation until the end of the production period, when all appropriate adjustments were made in conformity with the incentive production plan").  Accordingly, the Volume Overrides are not wages.

## CONCLUSION

For the reasons stated above, Wells Fargo's motion [13] (No. 09-CV-9410) for judgment on the pleadings as to Bader's complaint is DENIED with respect to Bader's breach of contract claim related to Volume Overrides on loans funded prior to June 1, 2009 and GRANTED in all other respects.  Wells Fargo's motion [12] (No. 10-CV-2717) to dismiss Auerbach's complaint is DENIED with respect to Auerbach's breach of contract claims related to commissions, President's Club and Partnership bonuses, and severance and GRANTED in all other respects.

Since Bader's claim to Volume Overrides and Auerbach's claims to commissions and a President's Club Bonus involve conditions that loans have funded as of a given date, facts showing that Wells Fargo deliberately prevented loans from funding as of that date would affect whether plaintiffs' failure to fulfill those conditions should prevent their recovery.  As difficult as it is to imagine the existence of such facts, if either plaintiff believes he can allege such facts consistent with the Federal Rules of Civil Procedure, that plaintiff shall have leave to filed an amended complaint as to those facts. In all other respects, dismissal is with prejudice.

SO ORDERED.

Dated: New York, New York
      March **24**, 2011

Richard J. Holwell
United States District Judge